UNITED STATES of America

v.

**Allan N. GOBERMAN.**

**Crim. No. 14794.**

United States District Court,
M. D. Pennsylvania.

June 11, 1971.

---

Robert C. Ozer, Sp. Atty., U. S. Dept. of Justice, for plaintiff.

Aaron M. Fine, Philadelphia, Pa., Howard Rubin, May, Grove, Stork & Rubin, Lancaster, Pa., for defendant.

## MEMORANDUM

NEALON, District Judge.

A one count indictment under 18 U.S. C. § 1014 charges that on June 30, 1965, defendant, Allan N. Goberman,[1]

"knowingly made a false statement of material facts in a net worth statement in applying for a $1,500,000.00 loan submitted to the York Federal Savings and Loan Association of York, Pennsylvania, a federal savings and loan association, for the purpose of influencing the York Federal Savings and Loan Association to approve and

1. 18 U.S.C. § 1014 provides, in pertinent part:

"Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of * * * a Federal Savings and Loan Association * * * upon any application, * * * Commitment, or loan, * * * shall be fined not more than $5,000 or imprisoned not more than two years, or both."

grant said $1,500,000.00 loan, in that Allan N. Goberman stated and represented therein a net worth of $2,017,400.00, whereas, as he then and there well knew, his net worth was only $268,393.49."

Trial was held before the Court without a jury on November 9 and 10, 1970, and decision reserved pending the filing of the transcript of the trial. The transcript now having been filed and the briefs of counsel submitted, the matter is ready for determination.

## FACTS

Defendant had been actively engaged in the construction business since 1945 and, by his own estimate, had built more than 1500 homes. His activities were conducted through various corporations in which he held a 98% interest, viz., Susquehanna Builders, Inc., Gobi Construction Company, Sutter Village Corp., Jamini-Tramo, Inc., and Lancashire Hall, Inc. In March of 1965, Lancashire Hall, Inc. (hereinafter Lancashire), was incorporated for the purpose of constructing a 200-bed nursing home on Lititz Pike, 3 miles north of Lancaster, Pennsylvania, on land to be acquired from Jamini-Tramo, Inc. The necessary surveys, drawings, plans and specifications had previously been prepared for defendant by an architect, Robert Weaver. Defendant, as 98% owner of Lancashire and the moving force behind the proposed project, submitted the proposal to the Federal Housing Administration for approval, but F.H.A. officials, while interested in a 100-bed nursing home, balked at the 200-bed proposition. In light of this, defendant, on behalf of Lancashire, during the month of May, 1965, sought financing directly from the York Federal Savings and Loan Association (hereinafter Association) and submitted the application to Mr. Stanley L. Gladfelter, President of the Association. The anticipated construction cost was approximately $2,000,000.00 and a loan of $1,500,000.00 was requested. Although defendant did all the negotiating with the Association there was never any suggestion that he would become personally liable for the loan. In the course of normal procedure, the application was to be submitted to a four-member executive committee of the Board of Directors who would subsequently make a recommendation on the merits of the loan to the full Board. Mr. Gladfelter informed defendant on Monday, June 29th, that the application would be presented to the executive committee on July 2nd. That same day, June 29th, defendant transferred $99,000 from certain corporate accounts to his private checking account thereby increasing his balance to $116,990.67. The transfers were $55,000 from Susquehanna Builders, Inc., $20,000 from School Valley Farms, Inc., $16,000 from Jamini-Tramo, Inc., and $8,000 from Sutter Village, Inc. Previously, on June 21st, he had transferred $3,000 from Sutter Village, Inc., to his personal account. On Tuesday, June 30th, defendant borrowed $250,000 from the Commonwealth National Bank, Lancaster, Pennsylvania, in order to purchase United States Treasury bills at a face value of $250,000, which were to be pledged immediately to the Bank as collateral for the loan. On Friday, July 2nd, defendant journeyed to Beach Haven, New Jersey, for vacation purposes and on Tuesday, July 6th, he placed a long distance telephone call to Mr. Gladfelter who informed defendant that one of the members of the executive committee suggested that defendant be required to submit a certified personal financial statement. When defendant protested that it might take months to obtain such certification from his accountant, Mr. Gladfelter suggested that he " * * * put a statement together and send it in to see if they would accept it without being certified." Defendant did submit a Financial Statement on a form which he had in his office and which bore the printing "Form Designed And Approved By The Bank Management Commission Of The American Bankers Association" prior to the meeting of the executive committee on Friday, July 9th, at which meeting the

executive committee authorized the Secretary to inform defendant that the Association was interested in the loan under certain specified terms and conditions. It is this Financial Statement that the Government contends was falsely made for the purpose of influencing the Association to approve the loan.

## DISCUSSION

Principally, the Government asserts that the Statement contained (a) an Asset entry showing $116,000.00 as "Cash on hand in Banks" without a corresponding entry under Liabilities indicating that $102,000.00 of this amount was owed to the corporations from which it was borrowed; (b) an inclusion of U. S. Treasury Bills of the value of $250,000.-00 without a corresponding entry showing the note payable to the Commonwealth National Bank in the same amount; and (c) a declaration of U. S. Series E and H Bonds in the amount of $80,000.00 whereas, in fact, the face value of all U. S. Bonds owned by defendant, his wife and children, or any combination of them, was $8,675. The Government has also challenged the values placed by defendant on his corporate holdings, his real estate ownership and the cash surrender value of his life insurance policies but I am not persuaded of defendant's guilt beyond a reasonable doubt by this proof and, consequently, do not regard these entries as falsely made. However, the failure to list the amounts owed to the respective corporations and the Commonwealth National Bank as well as the gross overvaluation of the U. S. Bonds renders the Financial Statement an objectively false statement of material facts. It must now be determined whether defendant knowingly made it for the purpose of influencing the Association to approve the loan.

Initially, the Court will note and reject the argument made by counsel on the brief (who did not participate in the trial) that there was no evidence that the Association was, in fact, a federal savings and loan association. Trial counsel conceded this fact and persistently asserted that the only issues before the Court concerned the alleged falsity of material matters and defendant's knowledge of the same.

■ The Government has the burden of proving beyond a reasonable doubt that defendant knowingly made a false statement as to a material fact with intent to mislead the officials of the Association into acting favorably upon Lancashire's loan application. It is not necessary to prove that the Association was, in fact, misled, Kay v. United States, 303 U.S. 1, 6, 58 S.Ct. 468, 82 L. Ed. 607 (1938), and the words "for the purpose of influencing" are included in order to define the quality of the required intent, United States v. Niro, 338 F.2d 439, 441 (2d Cir. 1964). Nevertheless, under the indictment in this case, it must be shown that defendant prepared and affixed his signature[2] to the Financial Statement with knowledge that it contained false information of his net worth* and that he communicated this false statement to the Association with the specific intent to mislead and deceive it into concluding that his net worth was greater than it truly was and thereby to influence it in acting favorably upon Lancashire's loan application.

2. Immediately above defendant's signature, the Financial Statement contains the following in standard print:
"In submitting the foregoing statement the undersigned guarantees its accuracy with the intent that it be relied upon by the aforesaid bank in extending credit to the undersigned and warrants that _____ has not knowingly withheld any information that might affect _____ credit risk; and the undersigned expressly agrees to notify immediately said bank in writing of any material change in _____ financial condition whether application for further credit is made or not and in the absence of such written notice it is expressly agreed that said bank in granting new or continuing credit may rely on this statement as having the same force and effect as if delivered upon the date additional credit is requested or existing credit extended or continued."

As hereinabove mentioned, there can be no serious dispute relative to the falsity of certain information contained in the statement, but whether defendant knew this and still submitted it intending to influence favorable action is another matter.

■ Knowledge and intent are rarely capable of direct proof and may be inferred from a defendant's conduct, statements, and all surrounding circumstances. Moreover, such circumstantial evidence need not conclusively exclude every other reasonable hypothesis, nor negative all possibilities, except guilt. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In the present case we have a defendant of wide and extensive experience in the home construction industry and its related financial aspects who decided to construct a 200-bed nursing home and formed a separate corporation to accomplish it; who needed to obtain a substantial loan of $1,500,000.00 for this corporation from private lenders in order to finance the same; who had transferred large sums of money from corporate accounts to his private account five days before the loan application was to be submitted to the Association's executive committee; who borrowed $250,000 from Commonwealth National Bank and purchased a like amount of Treasury Bills, which were used as collateral therefor, some four days before the proposed submission; whose corporate loan application had been temporarily held up by the executive committee pending the submission by him of a certified personal financial statement; who, faced with the urgency of the situation and the anticipated delay in obtaining such a statement from his accountant, prepared the statement himself on the advice of the Association's President and who submit-

ted the statement, while the loan application was pending, which contained erroneous information concerning his personal savings account, U. S. Treasury Bills and the amount of U. S. Bonds owned by him that would have the tendency to mislead or deceive others into believing that defendant's net worth was much greater than it was. These events constitute strong circumstantial evidence that defendant knowingly made a false financial statement for the purpose of influencing the approval of the loan. Defendant asserts to the contrary and contends that he transferred the corporate money to his own account because, for more than a month prior to June 30th, he had been in contact with Commonwealth National concerning the purchase of U. S. Treasury Bills and planned to use this cash in that transaction but changed his mind between June 29th and June 30th and decided not to use any cash in this purchase. He ascribed the omission of any reference to this money having been borrowed from his corporations as a "slip up." As to his failure to list the $250,000 note payable to Commonwealth National, defendant testified that he had prepared the Financial Statement in longhand and had left it with his Secretary to be typed and that he had listed this indebtedness but his Secretary inadvertently failed to type it into the statement. To support his assertion defendant produced a handwritten financial statement which he identified as the one he left with his Secretary but its reliability is undermined inasmuch as the $250,000 indebtedness is listed therein as payable to the Fulton National Bank[3] and not the true obligee, Commonwealth National. Defendant explains this as personal confusion resulting from the fact that he had accounts at both banks. Defendant testified further that he thought he

3. After borrowing $250,000 from Commonwealth National to purchase the Treasury Bills, defendant, using additional corporate funds and money from his personal account, paid off the loan on August 26, 1965, and then, on September 13, 1965, he went to the Fulton National Bank in Lancaster and pledged the Treasury Bills for another loan of $250,000.

had $80,000 in U. S. Bonds because he had been purchasing and accumulating them for many years. Finally, he explained that he thought he was worth two million dollars on paper and, furthermore, didn't think the Financial Statement was very important because the loan was to be made to the corporation and not to him personally.

However, defendant, with his long and diverse business experience, must have known that the Financial Statement was important. Indeed, he had such forms in his office so that his familiarity with their purpose cannot be minimized. By his own description he was a "one man operation." He was sufficiently knowledgeable in commercial and banking matters to anticipate that he, as the acknowledged owner of the Corporation, may be required to show his personal net worth. His borrowing of the full amount needed to purchase the Treasury Bills was admittedly a losing proposition as the interest on the note would be greater than the yield on the bills. His explanation that he had a credit limit of $80,000 with the Fulton Bank and was interested, as a businessman, in increasing it by the use of Treasury Bills as collateral was unpersuasive. Similarly unpersuasive was his insistence that the transfer of corporate funds to his personal account was in connection with this proposed credit experiment with the bank.

■■ The Federal Government certainly has the right to protect itself from fraudulent statements by enacting legislation requiring that information supplied to such institutions as a Federal Savings and Loan Association be given in good faith and not falsely with intent to mislead. Kay v. United States, supra. It is conduct such as appears in this case that the Statute was designed to cover. After carefully considering all the evidence, I am satisfied that the Government has established defendant's guilt beyond a reasonable doubt.