UNITED STATES of America, Appellee,

v.

**Paul J. SHEEHY, Defendant-Appellant.**

**No. 75–1361.**

United States Court of Appeals,
First Circuit.

Argued May 6, 1976.
Decided Sept. 7, 1976.

---

John Albert Johnson, Boston, Mass., with whom F. Lee Bailey, Boston, Mass., was on brief for appellant.

Michael A. Collora, Asst. U. S. Atty., Boston, Mass., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

After trial to a jury appellant was convicted on each of eight counts of an indictment charging him with making false statements in loan applications, and causing false entries to be made in bank records. 18 U.S.C. §§ 1005 and 1014 (1970). The court sentenced him to 60 days imprisonment and a probationary term of two years concurrent on all counts. On this appeal he challenges the sufficiency of the evidence and contends that certain of the counts in the indictment are multiplicitous and should have been merged. We examine these claims in order.

Evidence presented at trial indicated that appellant assisted in the founding of the Lowell Bank and Trust Company ("Lowell Trust") in 1969 and served as a director and secretary of the corporation, and also as a clerk, and a member of the bank's executive committee. The function of the latter group was to review all loans made by the bank. Appellant continued in these positions until February, 1973 at which time he resigned as clerk; in 1974 he resigned from all the other positions. During the period of his formal association with the bank he borrowed extensively from it. It is these loan transactions that are the primary basis of the charges against him.

In 1970 appellant borrowed $5,000 from the Lowell Trust; this loan was unsecured by any collateral. He defaulted on it in 1972 and it remained in default until June, 1974.[1] In March, 1972 appellant sought a mortgage loan from the bank for $30,000 for property in Seabrook, New Hampshire. (Count I). In his application[2] appellant listed the purchase price as $36,000. Although much of the application was incomplete it was reviewed and approved by the executive committee on the same day. A more complete application for the same

---

1. The amount of this loan (which was not involved in the indictment) constituted the legal lending limit for an officer of a Massachusetts bank on an unsecured loan. See M.G.L. c. 172, § 18 (1971).

2. Witness Marshall, a vice president and controller of the Lowell Trust testified to the bank's usual mortgage loan procedures. The customer completed an application; this would then be reviewed by the credit department which had an appraiser inspect the premises securing the loan. If the loan was approved a bank attorney would search title, file the mortgage, and certify on the back of the application that the mortgage was recorded and that the bank had the first lien. After receipt of a signed note from the mortgagee the transaction would be recorded in the bank's general ledger; there was also a specific loan ledger to indicate payments, taxes, etc. A down payment was typically required, which was usually 20 percent of the purchase price. Marshall indicated that both the amount of the down payment and the income of the applicant were "important" factors to the bank in deciding whether to approve a loan.

property dated April 20, 1971, was subsequently filed with the bank. This application listed appellant's income as $21,400 and the purchase price as $37,500. The testimony of a real estate broker involved in the transaction indicated that the actual purchase price of the Seabrook property was only $24,500. In addition, according to evidence from appellant's tax returns, his income was not $21,400 as he had stated in the application but somewhat under $16,000. After approval of the mortgage loan appellant received the $30,000 in the form of three cashier's checks ($23,500, $1,000, and $5,500 respectively) all payable to him personally. The note fell into default in 1972 and was not repaid until 1974.

On May 10, 1971, appellant applied for a mortgage loan from the Commercial Bank and Trust Company in Wilmington for property in Lowell, Massachusetts (Count II). On the loan application he listed the purchase price of the property as $26,000 and his income as $25,000 after taxes. He stated that he had only one liability, a mortgage to the Central Savings Bank for $14,000. He failed to list his $30,000 liability to the Lowell Trust. In addition, witness Maynard, the seller of the property in question, testified at trial that the selling price was only $20,000. Appellant's income tax returns for 1970 and 1971 indicated that his after-tax income in those years was less than $7,000.[3]

On February 13, 1973, appellant signed a personal financial statement which was filed with the Lowell Trust. Testimony at trial indicated that such statements were used by the bank in deciding whether to grant or maintain loans.[4] Ten days later he resigned his position as clerk,[5] and shortly thereafter obtained a $40,000 unsecured loan from the bank. In this financial statement, which was the subject of Count III, appellant indicated that his income was

$46,800; that he owed $66,000 on real estate and chattel mortgages; and that he had no contingent liabilities. He listed the price of the Lowell, Massachusetts property recently purchased as $25,000 and that of the Seabrook, New Hampshire property as $34,000. Although appellant certified that the information in the financial statement was "true and accurate" there were substantial misstatements. While the statement indicates $6,000 in cash on hand, appellant's account at the Lowell Trust was overdrawn. He had omitted listing among his liabilities a $5,000 unsecured note then owing at the Lowell bank, and an investigation by the FBI indicated that he also had a contingent liability of $17,000 (viz. a loan to one of his relatives by the Lowell Trust) which he failed to include on the statement. Moreover, evidence at trial indicated that his income in 1972 and 1973 was something less than $17,000 and not $50,000 as recorded on the form.

Counts IV through VIII of the indictment are based on a real estate transaction in March, 1973 involving the Lowell Trust. The relevant facts are as follows. In 1971 appellant had obtained an option to purchase a house at 10 Nashua Street in Seabrook, New Hampshire. In late 1972 he notified the seller's representative that he wanted to exercise the option and on March 4, 1973 transmitted a portion of the purchase price. It was not until late August of that year, however, that he made his final payment and obtained title to the property. On March 28, 1973, before he actually had title, appellant filed an application with the Lowell Trust for a $40,000 construction loan. His application was substantially incomplete. It failed to list the owner, the selling price, or his income. Despite these deficiencies the executive committee considered the application on the following day. Witness Marshall, a bank vice presi-

---

3. The testimony of an officer of the Commercial Bank and Trust indicated that the critical factors relied upon by the bank in reviewing loan applications were an applicant's income and liabilities, and the purchase price of the property.

4. For example, witness Marshall testified that such "financial statements are normally required prior to consideration of a loan."

5. This resignation was necessary since a bank officer could receive only $5,000 in unsecured loans from his own bank, see n. 1 supra.

dent, testified that appellant was present at this meeting and that he claimed to have a commitment for a permanent mortgage on the property.[6] The executive committee approved the application on March 29 notwithstanding the lack of documentation, and appellant received $10,000 in cash the same day.

Further legal work on the loan was handled for the bank by one Owens, a law associate of appellant. Owens testified that he received the documents from appellant's secretary in April, 1973 and began checking legal title; he concluded that the original seller of the property still had title. Nevertheless, Owens certified on the back of the application that the Lowell Trust's mortgage was recorded. He did not, however, actually file the mortgage, but instead gave the mortgage and the application to appellant's secretary who turned it over to the appellant.[7] Appellant himself refiled with the bank the application containing the certification,[8] although he was aware that the mortgage had not been recorded. See n. 13 infra. Although the bank's ledger card indicated the loan was secured, in fact no mortgage was ever filed on this property running in favor of the bank.

Disbursements to appellant on this construction loan continued through June, 1973 and totalled $36,000. All payments were in cash except for a credit memo of $2,000.[9]

Both this construction loan and appellant's previous unsecured loan of $40,000 fell into default in the spring of 1973. By May of that year appellant owed the bank $113,000 plus additional monies from an overdraft in his account of approximately $4,800.

The government also presented at trial testimony that was designed to establish appellant's motivation for the double financing on the 10 Nashua Street property, see discussion and n. 6 supra. Witness Bowers, a law associate of appellant, testified that appellant had run for Congress in 1972 and that in March, 1974 had admitted he still owed money from that campaign totalling $20,000 in addition to an outstanding $1,000 gambling debt. Witness Desmond, an officer of Lowell Trust who had attempted to collect $86,000 which appellant owed the bank, testified that appellant explained the debt as due in part to excessive gambling and to campaign expenses. Testimony in a similar vein was given by witness Lampert, an attorney for the Lowell Trust who had discovered that the bank's construction loan to appellant was never secured by a mortgage on the 10 Nashua Street property.

■ Appellant contends there was insufficient evidence to convict him in Counts I, II, III, V, and VII, each of which charged a violation of 18 U.S.C. § 1014 (1970).[10] In evaluating such a claim our criterion is

**6.** Marshall's testimony indicated that it was the policy of the bank that permanent financing was necessary before approval would be given for a construction loan. Although appellant represented at the executive committee meeting on March 29 that he had permanent financing for this construction loan (purportedly from the Lowell Five Cents Savings Bank), he did not in fact approach the latter bank until June. He eventually did get permanent financing from that bank in July. In obtaining the permanent mortgage, however, he failed to inform the Lowell Five Cents Savings Bank about the lien on the 10 Nashua Street property held by the Lowell Trust to secure its construction loan (or, more accurately, purportedly held by Lowell Trust, since appellant failed to file the Lowell Trust's construction mortgage, see discussion infra.) The Lowell Five Cents Savings Bank granted the loan on the assumption that it had a first mortgage which was recorded.

**7.** Owens testified that he later tried to have appellant file the mortgage without success despite appellant's assurances that he was "going to take care of it."

**8.** Certification is of considerable significance for a bank in that it establishes that title for the bank has in fact been cleared and that there are no prior liens or attachments on the property.

**9.** The payments were recorded on a mortgage ledger card, the first entry being made on the date of the first check to appellant (March 29).

**10.** Section 1014 provides in pertinent part:
   "Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purposes of influencing in any way the action of . . . any . . . bank . . . upon any application . . . or loan, or any change or extension of . . . the same,

"whether a rational juror drawing reasonable inferences from the evidence viewed in the light most favorable to the government could have found guilt beyond a reasonable doubt." *Villarreal Corro v. United States*, 516 F.2d 137, 140 (1st Cir. 1975) (citations omitted). The challenged counts all involved the making of allegedly false statements to influence bank actions. Count I dealt with appellant's application to Lowell Trust for a mortgage on property in Seabrook, New Hampshire. In this application he stated that the purchase price was $37,500 [11] when it was actually $24,500; and he stated his income as $21,400, although it was under $16,000.

Appellant's principal contention [12] is that the discrepancy in purchase price was not shown to be a material false statement made with the intent of fraudulently influencing the bank's action. In this regard he points out that the bank's appraisal of the property in question was $36,000 and claims that therefore the bank was not misled by the value stated on the application of approximately the same amount. *See* n. 11 *supra*. This claim, however, cannot prevail. Testimony indicates that bank policy restricted mortgages to 80 percent of the purchase price (with the remainder a required down payment on the property), and that purchase price was one of the factors governing the bank's decision whether to approve a loan. In light of appellant's extensive association with the bank it would not be unreasonable for the jury to infer he was aware of these facts. "The words 'for the purpose of influencing' were included in the statute to define the quality of the required intent, . . . and the jury was more than entitled to believe that the [appellant] acted with this intent." *United States v. Niro*, 338 F.2d 439, 441 (2d Cir. 1964). *See Kay v. United States*, 303 U.S. 1, 5–6, 58 S.Ct. 468, 82 L.Ed. 607 (1938); *Kovens v. United States*, 338 F.2d 611, 616–17 (5th Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1338, 14 L.Ed.2d 271 (1965); *cf. United States v. Sabatino*, 485 F.2d 540, 544 (2d Cir. 1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974); *United States v. Barbato*, 471 F.2d 918, 922 (1st Cir. 1973). A similar analysis applies to appellant's providing incorrect and inflated figures for his income and for the purchase price of property in Lowell, Massachusetts on a mortgage loan application to the Commercial Bank and Trust Company (Count II).

Count III was based upon false statements that appellant made to the Lowell Trust on a financial statement dated February 13, 1973. *See* discussion *supra*. He now claims there was no showing that these statements were material. Specifically, he contends that since the bank approved his loan request "in spite of his default position with respect to numerous prior loans, . . . the statements lacked the capacity to influence." We do not find this claim persuasive. First, we note that the information in the statement was normally required of loan customers. Given appellant's involvement as a bank director, he "must have known that the Financial Statement was important"; "his familiarity with [its] purpose cannot be minimized." *United States v. Goberman*, 329 F.Supp. 903, 907 (M.D.Pa.1971). Furthermore, the statement itself gave notice to appellant that in signing it he was certifying to the truth and accuracy of the information on the form. The jury could reasonably infer that appellant knew that much of the information was false. And it is clear that the information possessed the capacity to influence the

. . . shall be fined not more than $5,000 or imprisoned not more than two years, or both."

11. Appellant submitted two applications for a loan for this property. In the first, which was dated March 30, 1971 and was incomplete, the purchase price was stated as $36,000. In the second, dated April 20, 1971, the amount was listed as $37,500.

12. Appellant also contends that since the amount of his income was left blank on the initial application, *see* n. 11 *supra*, it could not have influenced the bank. We note, however, that the second (complete) application was on file at the bank before the proceeds of the loan were disbursed to appellant.

bank's decision. This was sufficient evidence to sustain a conviction. *See Kay v. United States, supra* at 5–6.

With respect to the false statements in the loan application to the Lowell Trust dated March 28, 1973 (Count V), appellant contends that because the bank's actions concerning approval of the loan in question fell "woefully short of the normal banking procedures, . . . it can be reasonably inferred that [the bank] disregarded the statements in the application when granting the loan," and that its "actions amounted to an authorization and acceptance of the loan as an unsecured obligation." We do not find merit in this claim. Although normal procedures were circumvented in appellant's case, it does not necessarily follow that the false information totally lacked the capacity to influence. In light of testimony indicating the bank's concern and interest in checking the mortgage allegedly securing the loan in question, it would appear that certain decision-makers in the bank "still remained to be influenced," *United States v. Niro, supra* at 441, and this was a valid basis for the jury to find that the "false statements were made 'for the purpose of influencing' . . . ." *Id.* Appellant's challenge to Count VII suffers from a similar flaw. This count dealt with false statements in the refiled [13] mortgage

applications for the 10 Nashua Street property, principally the indication in the accompanying certification that the bank's mortgage was recorded. Appellant contends that the false statement could not have misled or influenced the bank because it had already begun making disbursements to appellant on the loan.[14] We do not find this claim to be persuasive, however, in view of the fact that after receiving the certification the bank continued making disbursements to appellant, a course it well might not have pursued had it known that the certification was false and that it did not have a first mortgage.

Appellant also claims there was insufficient evidence to convict him on Counts IV, VI, and VIII, each of which charged the making of allegedly false entries in bank records in violation of 18 U.S.C. § 1005 (1970).[15] Count IV charged that appellant as a director of Lowell Trust caused a false entry to be made in the bank's minute books; the entry in question concerned appellant's statement to the executive committee on March 29, 1973, with respect to his application for a construction loan that he had a commitment for a permanent mortgage.[16] The government introduced evidence at trial indicating that appellant had no such mortgage commitment at the time he made this statement.

**13.** It appears that after appellant's initial application was approved by the bank on March 29, 1973, he withdrew it and gave it to his secretary who typed the mortgage deed and the note. She in turn gave the papers to appellant's law associate Owens, who discovered in the course of checking title that the title was still in the name of the seller. Owens apparently certified that the mortgage was recorded in favor of the bank without actually completing that step. *See* discussion and nn. 6–7 *supra.* He returned the papers to appellant's secretary who gave the documents to appellant. When appellant filed the certification sometime after April 16, 1973, it wrongly indicated that title was with the bank when in fact there was no recorded mortgage.

**14.** Appellant claims alternatively that there was no actual misstatement. Specifically, he points to language in the note to the effect that it was "secured by a mortgage . . . *to be recorded.* . . ." (Emphasis supplied.) He contends that the prospective nature of this language led to an "honest mistake" by Owens

concerning the recording of the mortgage and that he never actually told Owens that the mortgage had been recorded. We do not, however, find this argument so persuasive that the issue need have been removed from the jury's consideration nor that it precludes the jury's finding against appellant.

**15.** Section 1005 states in pertinent part:

"Whoever, being an officer [or] director . . . of any . . . insured bank . . . makes any false entry in any book, report or statement of such bank with intent to injure or defraud such bank . . . or to deceive any officer of such bank . . . or the Federal Deposit Insurance Corporation. . . Shall be fined no more than $5,000 or imprisoned not more than five years, or both."

**16.** The exact wording of the entry was: "Sheehy reported he has committment [sic] for permanent mortgage."

As noted earlier, appellant's construction loan application was approved on March 29, 1973, and he received an initial $10,000 disbursement on that date. The latter transaction resulted in an entry being made on the bank's ledger card indicating that a *secured* construction loan existed on the 10 Nashua Street property. Count VI charged that the ledger entry was false because appellant never intended the loan to be secured by a real estate mortgage. Count VIII alleged the same type of violation with respect to an entry on the general ledger.

With respect to Count IV appellant contends the government failed to show a violation of § 1005 because the entry in the minutes regarding his report of a commitment for a permanent mortgage was not materially false in that the loan was "an actual transaction" accurately reflected on the bank's books. Under the circumstances this claim is not persuasive. While it is true that "the making of a false entry is a concrete offense, which is not committed where the transaction entered actually took place, and is entered exactly as it occurred," *Coffin v. United States,* 156 U.S. 432, 463, 15 S.Ct. 394, 39 L.Ed. 481 (1895); *see Laws v. United States,* 66 F.2d 870, 873 (10th Cir. 1933); *Twining v. United States,* 141 F. 41, 44 (3d Cir. 1905), nevertheless the crime includes actions in which an entry concerning a particular transaction is "made to represent what is not true or does not exist. . . ." *United States v. Darby,* 289 U.S. 224, 226, 53 S.Ct. 573, 77 L.Ed. 1137 (1933) (Cardozo, J.); *see Agnew v. United States,* 165 U.S. 36, 52, 17 S.Ct. 235, 41 L.Ed. 624 (1897). In *Darby,* for example, the transaction involved several discounted promissory notes. The notes in question "bore the genuine signature of J. G. Darby as maker," 289 U.S. at 225, 53 S.Ct. at 574, but the signature of the "co-maker or endorser" was a forgery. *Id.* The defendant, who knew that there was in fact no valid co-maker or endorser, entered the latter's name in the bank's discount book. The Supreme Court held that this made out a violation of § 1005, stating that: The aim of the statute "was to give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition." *Id.* at 226, 53 S.Ct. at 574; *cf. United States v. Biggerstaff,* 383 F.2d 675, 678 (4th Cir. 1967); *Meredith v. United States,* 238 F.2d 535, 540 (4th Cir. 1956). A similar situation prevails in the present case. Although appellant may be technically correct in noting that the bank's books reflected a loan which actually existed, the books listed this as a *secured* loan whereas the loan was in fact unsecured since appellant had no mortgage commitment at the time, contrary to his statement to the executive committee. This was an important financial disparity affecting the bank's "true condition." Clearly, then, appellant's false statement to the committee was capable of misleading the officers of the bank.[17]

Appellant's challenge to Counts VI and VIII is in a similar vein. He contends that the entries in the general ledger and on his ledger card reflected a real transaction, viz. credit that was actually given. This claim, however, again fails to take into account the fact that there is a substantial difference between a secured and an unsecured loan. *See* discussion *supra; United States v. Darby, supra.* Appellant also claims that there could be no basis for showing a specif-

---

17. Appellant also contends that the government failed to show that the entry in the bank's minutes was made as a result of his position as a director; he claims that when the entry was made, he "was merely in the same position as any other borrower. . . ." We do not agree. Appellant was a director at the time of the transaction in question, and his appearance before the executive committee was hardly a privilege accorded to every borrower.

Appellant also argues that he did not have a specific intent to defraud. He points to the fact that he obtained a mortgage several months later from the Lowell Five Cents Savings Bank for the property in question. We fail to see how this subsequent event can nullify appellant's prior act. As the Supreme Court has noted in a very similar context, "[t]he case is not one of an action for damages but of criminal liability and actual damage is not an ingredient of the offense." *Kay v. United States,* 303 U.S. 1, 6, 58 S.Ct. 468, 82 L.Ed. 607 (1938).

ic intent to defraud with respect to the loan obtained in March, 1973, since it was not until April 16, when the bank received his mortgage note, that it could reliably have made a ledger entry indicating that the loan was secured by a real estate mortgage.[18] However, we find no merit in this claim. Appellant ignores the fact that after he spoke in favor of his application for a secured construction loan to the executive committee on March 29, 1973, the loan was approved and he received $10,000 *on that date.* This payment led to ledger entries that are the subject of the charges against him. Moreover, although appellant did not himself actually make the entries, there was sufficient evidence to indicate that his improper actions caused them to be made in the normal course of the bank's business. *United States v. Giles,* 300 U.S. 41, 48–49, 57 S.Ct. 340, 81 L.Ed. 493 (1937); *see Morse v. United States,* 174 F. 539, 547, 552–53 (2d Cir.), *cert. denied,* 215 U.S. 605, 30 S.Ct. 406, 54 L.Ed. 346 (1909).[19]

■ Appellant also contends that various counts in the indictment are prejudicially duplicitous.[20] He failed, however, to raise this objection prior to trial. Fed.R.Crim.P. 12(b)(2) specifically provides that "[d]efenses and objections based on defects . . . in the indictment . . . other than that it fails to show jurisdiction in the court or to charge an offense" may be raised only by motion before trial. Accordingly, appellant may not raise this question on appeal. *United States v. Barbato, supra* at 921; *see Mitchell v. United States,* 434 F.2d 230, 231 (9th Cir. 1970), *cert. denied,* 402 U.S. 946, 91 S.Ct. 1636, 29 L.Ed.2d 115 (1971); *United*

*States v. Private Brands, Inc.,* 250 F.2d 554, 557 (2d Cir. 1957), *cert. denied,* 355 U.S. 957, 78 S.Ct. 542, 2 L.Ed.2d 532 (1958); *Anderson v. United States,* 189 F.2d 202, 204 (6th Cir. 1951). Moreover, since appellant's sentence is concurrent on all counts, as a practical matter he is not prejudiced. *Id.*

*Affirmed.*

---

18. Appellant also contends that there was insufficient evidence of criminal intent since the mortgage note only stated that the mortgage was "to be recorded." We have already rejected this argument, however. *See* n. 14, *supra.*

19. Appellant further asserts that a prima facie violation of § 1005 was not established because the government's evidence was "at least as consistent with a reasonable hypothesis of innocence as that of guilt." Such is not the rule, however, in this circuit. *See United States v. Currier,* 454 F.2d 835, 838 & n. 6 (1st Cir. 1972); *Dirring v. United States,* 328 F.2d 512, 515 (1st

Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964).

20. Technically, "duplicity is the charging of several separate offenses in a single count." *Tripp v. United States,* 381 F.2d 320, 321 (9th Cir. 1967); *see* 8 J. Moore, Federal Practice ¶ 8.03 (2d ed. 1976). Here, in view of the fact that appellant claims that various pairs of counts (specifically Counts VI and VIII, V and VI, and VII and VIII) "should have been merged" it would appear that he challenges the various counts as multiplicitous, and we treat his challenge in this fashion.