# United States Court of Appeals
## For the First Circuit

No. 22-1518

UNITED STATES,

Appellee,

v.

ELIJAH MAJAK BUOI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Gelpí, Lynch, and Thompson,
Circuit Judges.

Scott T. Garosshen, with whom Seth B. Orkand, Mallori D. Thompson, and Robinson & Cole, LLP were on brief, for appellant.
Javier A. Sinha, Attorney, U.S. Department of Justice, with whom Rachael S. Rollins, United States Attorney, Donald Lockhart, Assistant United States Attorney, Mackenzie Queenin, Assistant United States Attorney, Della Sentilles, Trial Attorney, U.S. Department of Justice, Kenneth A. Polite, Jr., Assistant Attorney General, and Lisa H. Miller, Deputy Assistant Attorney General were on brief, for appellee.

October 13, 2023

**GELPÍ**, <u>Circuit Judge</u>. Defendant-Appellant Elijah Majak Buoi ("Buoi") applied for multiple Paycheck Protection Program ("PPP") loans for his startup company, Sosuda Tech LLC ("Sosuda"), at the beginning of the COVID-19 pandemic. The Government investigated and charged Buoi for devising a scheme to defraud and obtain PPP funds by filing fraudulent PPP loan applications, and he was ultimately indicted on four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of making false statements to a financial institution, in violation of 18 U.S.C. § 1014. At trial, Buoi moved for judgment of acquittal at the close of the Government's case on the grounds that the Government provided insufficient evidence to prove beyond a reasonable doubt that he intended to defraud or influence a financial institution. The district court denied the motion. Buoi renewed the motion at the close of his case, resulting in another denial. Buoi was subsequently convicted on all five counts. Boui appeals the conviction, challenging the sufficiency of the evidence presented as to intent, in addition to two ineffective assistance of counsel claims. We affirm the district court and dismiss Buoi's ineffective assistance of counsel claims without prejudice. <u>See</u> <u>United States</u> v. <u>Mala</u>, 7 F.3d 1058, 1063 (1st Cir. 1993).

## I. Background

### A. Facts

The facts that follow are derived from the testimony and exhibits presented at trial. Because there is a claim of insufficient evidence, "we recount the facts in the light most favorable to the verdict." United States v. Paz-Alvarez, 799 F.3d 12, 18 (1st Cir. 2015).

Buoi registered his company, Sosuda, with the Massachusetts Secretary of State on May 1, 2019, about a year before the COVID-19 pandemic.[1] Sosuda was a technology company designed to serve communities with limited technological resources. Buoi, on behalf of Sosuda, did not file tax returns for 2019 or 2020, and the company was not registered with the Massachusetts Department of Unemployment Assistance ("DUA"), meaning that it was not paying unemployment taxes. Sosuda did not have employees in 2019 or 2020.

In March 2020, COVID-19 was declared a pandemic. Congress responded by passing the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, 15 U.S.C. §§ 9001-9141, to aid Americans negatively impacted by the COVID-19 pandemic. As a part of the act, the PPP was initiated to provide small businesses with financial assistance to keep their employees on the payroll and to

---

[1] Sosuda was originally registered as "South Sudanese American Technologies, LLC," but was renamed "Sosuda" on May 15, 2019.

cover specified expenses. CARES Act, ch. 116, 134 Stat. 286, 286-94 (2020) (codified as amended at 15 U.S.C. § 636(a)(36)). Under the program, PPP loans were issued by private lenders but were guaranteed by the Small Business Administration ("SBA") in the event that a borrower defaulted.

To obtain a PPP loan, a business was required to submit an application certifying the business's average monthly payroll expenses for the prior year, the number of employees, and whether the United States was the principal place of residence for all employees on the payroll. If the business did not have prior payroll expenses or existing employees, the business did not qualify for a PPP loan. By signing the application, the business's authorized representative certified that any loan funds "[would] be used to maintain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments" and that they "unders[tood] that if the funds [were] knowingly used for unauthorized purposes, the federal government [could] hold [them] legally liable, such as for charges of fraud." The applicant must have further certified that the information provided was "true and accurate" and that "making a false statement to obtain [the loan] [wa]s punishable under the law."

Additional documents that were often filed with the PPP application included the IRS Form 940 and IRS Form 941. An IRS Form 940 is an annual tax return document filed by a company

- 4 -

pursuant to the Federal Unemployment Tax Act, showing the total compensation paid to its employees. An IRS Form 941 is a quarterly tax return document filed to report Social Security taxes, income taxes, and Medicare taxes withheld from employee paychecks.

On April 21, 2020, Buoi attended a virtual PPP loan seminar and, according to his handwritten notes, the PPP was created to "help[] business[es] keep their workforce employed during the Coronavirus COVID-19 crisis" and "to provide a direct incentive for small businesses to help to keep their workers on the payroll." Between April 2020 and June 2020, Buoi applied for six different PPP loans with four lenders. There were multiple inconsistencies in the loan applications and documentation submitted by Buoi, taken in turn below.

Bank of America PPP Loan Applications

Buoi submitted a PPP loan application to Bank of America ("BOA") on April 21, 2020, seeking $9,400,000, claiming Sosuda had 353 employees, an average monthly payroll of $3,000,000, and certifying the United States as the principal place of residence for his employees. Buoi also submitted Excel sheets as payroll documentation, justifying the $3,000,000 in payroll based on the expenses for the last seven months of 2019 and for two weeks in February 2020. BOA did not credit these Excel sheets, so tax forms were requested. Buoi told the BOA employee that he had very little payroll in 2019 and did not file 2019 taxes. The BOA employee

- 5 -

told Buoi that these forms were required for the loan process to continue. After this communication, Buoi submitted an IRS Form 941 with what he claims are projections, stating that Sosuda had 353 employees and paid $9,498,987 in wages, tips, and other compensation during that period. This form was backdated to April 30, 2020. In addition, Buoi submitted an IRS Form 940 stating Sosuda made $34,800,000 in payments to employees in 2019 and had no employees in any other state but Massachusetts. This form was backdated to January 31, 2020. BOA denied the PPP loan application.

Buoi submitted a second PPP loan application to BOA on May 29, 2020, claiming 95 employees and $800,000 monthly payroll. The IRS Form 941 submitted with this application claimed 96 employees with $2,400,000 in wages, and the IRS Form 940 submitted claimed $9,600,000 paid to employees. BOA denied this loan application as well.

Lendio PPP Loan Applications

Buoi applied to Lendio for a PPP loan on May 21, 2020, seeking $1,900,000. Buoi claimed that he had 18 employees and an average monthly payroll of $150,000. Buoi certified in this application that Sosuda's employees' principal place of residence was the United States, Sosuda in fact had employees, the funds would be used to retain workers, and all of the information provided was true and accurate. The IRS Form 940 Buoi submitted

- 6 -

with this application stated that Sosuda paid its employees $1,800,000, and the IRS Form 941 stated Sosuda had 18 employees in the first quarter of 2020 and paid them $450,000. Both forms were backdated, as they were in the BOA application. Buoi also provided Excel sheet payroll documents, like the ones included in his BOA application, covering the same time period, albeit with different numbers. Lendio denied this application.

Buoi submitted a second application to Lendio on May 29, 2020, claiming to have 95 employees and an average monthly payroll of $800,000. During this time, Buoi had a list of potential employees curated by LinkedIn and Indeed (which are employment-focused websites) who had not actually started working for Sosuda. Lendio requested an employee list in addition to Buoi's PPP loan application and 2019 tax return documents. In response to Lendio's request, Buoi sent a list of approximately 100 employees, including the date they were hired, their full-time status, and taxes deducted with net earnings. The list of employees contained some entries with missing last names and some of the listed employees were colleges or universities, like Penn State and Wilson College. There were 35 examples of crossover between the list of potential employees Buoi wished to hire and the list Buoi provided to Lendio in support of his PPP loan application claiming that said employees were on payroll. It is unclear from the record whether this application was accepted.

### Fundbox PPP Loan Application

Buoi applied for a PPP loan from Fundbox on June 7, 2020, certifying that the funds sought were going to be used to retain employees already on the payroll and that the information provided in the application was true and accurate. Buoi claimed that Sosuda had 96 employees and an $800,000 average monthly payroll. Accompanying this application were IRS Form 940, claiming $9,600,000 paid to employees, and IRS Form 941, claiming 96 employees and $2,400,000 in wages, tips, and compensation paid, both backdated the same as before. Fundbox approved this loan and transferred $2,000,000 to Sosuda's account.

### Newtek PPP Loan Application

Buoi then applied for a PPP loan with Newtek on June 9, 2020, using the same figures and dates as the Fundbox application -- 96 employees and $800,000 average monthly payroll -- and the same tax documents as the Fundbox application -- IRS Form 940, claiming $9,600,000 paid to employees, and IRS Form 941, claiming 96 employees and $2,400,000 in wages, tips, and compensation paid. This loan application was denied.

### Buoi's Use of the PPP Funds

The PPP funds provided through the PPP program were to be used to maintain payroll for employees who had their primary residence in the United States, and for other specific expenses,

like rent and mortgage payments.  Buoi, however, withdrew $7,200 in cash and wired $20,000 to India, with the word "payroll" in the memo line, out of the $2,000,000 in PPP funds from Fundbox.  The remainder of the funds were seized by the Government following its investigation.

## B. Procedural History

Following a Government investigation, a grand jury indicted Buoi on four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of making false statements to a financial institution, in violation of 18 U.S.C. § 1014.  The four counts of wire fraud were for the PPP loan applications Buoi submitted to Lendio on May 21, 2020, Fundbox on June 7, 2020, and Newtek on June 9, 2020, as well as the $2,000,000 transfer from Fundbox to Buoi on June 15, 2020.  The false-statement count stemmed from the PPP loan application Buoi submitted to BOA.

Buoi's three-day jury trial commenced on February 22, 2022.  The Government presented the evidence recounted above at trial.  Once the Government rested, Buoi moved for a directed verdict of acquittal claiming that the Government had not proven the intent element of wire fraud or influencing a financial institution.  Buoi argued that his admission to BOA that he had no employees and the fact that he was asking for clarification on the PPP loan application process shows that he was simply mistaken about the program's requirements when he submitted the documents.

- 9 -

The court denied the motion. Buoi then testified in his own defense. When the defense rested, Buoi's counsel renewed the motion for a directed verdict of acquittal, claiming Buoi's testimony strengthened the position that Buoi was misled and that the submission of his application and documents was a good faith mistake. The district court denied the motion stating that the issue was a question for the jury and that there was sufficient evidence to sustain a conviction.

The jury instructions on intent and good faith were discussed by the parties and the court at great length. Both parties proposed instructions, and, eventually, the court decided to instruct the jury, using the Government's proposed instruction, that "[i]f the defendant acted in good faith, he cannot be guilty of the crime" and "[t]he burden to prove intent, as with all other elements of the crime, rests with the government." The jury was so instructed and there was no objection by Buoi as to the good faith instruction. Given the concerns about a juror's schedule and court closure due to an impending snowstorm, the jury was also told that it could "take as much time or as little time as you think is appropriate to make this decision. None of you should feel any pressure whatsoever to make a decision today or at any other time." The jury deliberated for approximately four hours and returned a guilty verdict on all five counts. At the conclusion of the verdict, the court asked if Buoi would like to

poll the jury, which his counsel declined.  The district court ultimately sentenced Buoi to thirty-nine months of imprisonment to be served concurrently on each count followed by three years of supervised release.  This timely appeal as to his conviction followed.

## II. Discussion

Buoi raises the following arguments on appeal: (1) insufficient evidence of his intent to defraud, (2) insufficient evidence of his intent to influence a financial institution, (3) ineffective assistance of counsel for requesting an undermining jury instruction, and (4) ineffective assistance of counsel for failing to poll the jury.  The Government contends that there was sufficient evidence for a rational jury to convict Buoi and that his ineffective assistance of counsel claims are not cognizable on direct appeal.  We conclude that sufficient evidence supported Buoi's convictions, affirming the district court, but decline to reach the merits of the ineffective assistance of counsel claims, for the reasons discussed below.

### A. Insufficient Evidence Claims

Standard of Review

A defendant may move for and obtain a judgment of acquittal based on insufficient evidence under Federal Rule of Criminal Procedure 29 ("Rule 29").  See Fed. R. Crim. P. 29.  Buoi preserved for appeal the challenge to the sufficiency of evidence

by moving both at the close of the Government's case and his own. See United States v. Stein, 233 F.3d 6, 20 (1st Cir. 2000). We review a preserved Rule 29 claim de novo. United States v. Millán-Machuca, 991 F.3d 7, 17 (1st Cir. 2021) (citing United States v. Santos-Soto, 799 F.3d 49, 56 (1st Cir. 2015)).

Challenging the sufficiency of the evidence is a "difficult task." United States v. Martin, 228 F.3d 1, 10 (1st Cir. 2000). As explained above, the evidence is viewed in the light most favorable to the verdict, Paz-Alvarez, 799 F.3d at 18, and we focus our inquiry on "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bailey, 405 F.3d 102, 111 (1st Cir. 2005) (citation and internal quotation marks omitted). "The court must credit both direct and circumstantial evidence, without evaluating or speculating on the weight the jury has given different pieces of evidence, and without making its own judgments as to credibility." Martin, 228 F.3d at 10. The jury may draw conclusions from the totality of the evidence presented, as opposed to evaluating pieces of evidence individually. Id. Our inquiry is not "to determine if alternate interpretations of the evidence were available," only whether "the evidence was sufficient for the jury to reach a reasonable interpretation" to convict. Id. at 18. "[W]e will reverse only if the verdict is irrational." United States v. Connolly, 341 F.3d 16, 22 (1st Cir. 2003).

## 1. Wire Fraud Convictions

The jury found Buoi guilty on all four counts of wire fraud, in violation of 18 U.S.C. § 1343.  Wire fraud has three elements: "1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the scheme."  United States v. Cassiere, 4 F.3d 1009, 1011 (1st Cir. 1993) (citation omitted).  Buoi takes issue only with the second element, arguing that no reasonable jury could have found intent to defraud beyond a reasonable doubt because he truthfully told BOA that he had little payroll and no tax forms, and because the evidence relied upon by the Government was speculative and insufficient.  Buoi's arguments are, in effect, an attempt to convince us that the jury should have made different inferences based on the evidence presented. We disagree, taking each of his arguments in turn.

Buoi, first, mistakenly attempts to argue that his statements to BOA undermine the evidence of intent needed to uphold the four counts of wire fraud convictions.  But those convictions were not based on his dealings with BOA.  And there is no evidence that the other lenders knew of his statements to that bank. Furthermore, to the extent Buoi argues that the jury could have inferred from these statements to BOA that he did not intend to defraud the other lenders, the jury was entitled to come to

whatever rational conclusion it saw fit based on the evidence presented and it is not our role to second-guess its conclusion. See United States v. Soler-Montalvo, 44 F.4th 1, 8 (1st Cir. 2022).

Next, Buoi argues that the evidence presented as to his alleged intent to defraud was insufficient. Specifically, he argues that the evidence presented was entirely consistent with the theory he presented at trial: that he submitted documents "as a projection of how he intended to use the payroll, the proceeds from the loan." To that end, he describes how each, individual piece of the Government's evidence as to intent is consistent with his theory and inconsistent with an intent to defraud. We reject these arguments. See United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989) (noting that the Government need not "'preclude every reasonable hypothesis inconsistent with guilt' in order to sustain a conviction" (quoting United States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir. 1985))).

As an initial matter, our task is to "view[] the facts as a whole, not in splendid isolation." Webster v. Gray, 39 F.4th 27, 38 (1st Cir. 2022) (citations omitted). "[W]e do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." United States v. Seary-Colón, 997 F.3d 1, 12 (1st Cir. 2021) (citations omitted). Viewing the evidence, accordingly, as a whole, there was abundant evidence from which a jury could easily conclude Buoi knowingly

- 14 -

and intentionally lied to the lenders: his numerous false statements in the applications and supporting documents; his giving different figures to different lenders which he said covered the same periods; his failure to file with the IRS his "tax forms" and his backdating these forms to make it appear to lenders the forms had been timely filed; his creation and use of these false "tax forms" to mislead lenders; and his improper use for personal purposes of the PPP funds he obtained through his deceit, all reinforcing his wrongful intent. We need not detail the overwhelming evidence of guilt any further.

Relatedly, Buoi makes three additional arguments in support of his claim that there was insufficient evidence of his intent to defraud, the first being that he called BOA with questions, which supposedly undermines a finding of intent to defraud. This argument fails because (again) the wire fraud charges pertain to the other lenders, not BOA. Even if the argument pertained to other lenders, as stated above, the applications themselves, and the seminar Buoi attended, made it clear what qualified a business for the loan, permitting a jury to conclude he understood he was not qualified despite his testimony to the contrary.

Second, Buoi argues that there was scant evidence of his linguistic or legal proficiency, thus undermining his intent to defraud. However, there was evidence presented at trial that Buoi

had a Master's of Science Degree in Innovation and Technology from the University of Massachusetts Lowell and selected English as his preferred language for the PPP loan applications.  The jury also observed Buoi's proficiency in English when he testified in his own defense.  This is another attempt to characterize the evidence in Buoi's favor, when it is obvious that the jury made the opposite inference.  See Soler-Montalvo, 44 F.4th at 8.  The jury was permitted to conclude that, because Buoi had an advanced degree from a United States university and indicated English to be his preferred language, he was able to read and understand the applications with the PPP program requirements and attestations he made.  Therefore, he intended to defraud.

Lastly, Buoi argues that the Government's reliance on his defensiveness on the stand does not demonstrate an intent to defraud.  Even crediting Buoi's claim, we fail to see the significance of it, given that the Government presented ample other evidence demonstrating his intent to defraud.

Ultimately, the various claims Buoi makes, as addressed above, are an attempt to argue that individual pieces of evidence, viewed through his own interpretation, undermine the jury's finding that he intended to defraud.  Having reviewed the trial record as a whole, however, we easily conclude that there was sufficient evidence of Buoi's intent to defraud for his wire fraud convictions.

## 2. False Statement To A Financial Institution Conviction

The jury also found Buoi guilty of making a false statement to a financial institution, in violation of 18 U.S.C. § 1014. Proving a false statement to a financial institution requires three elements to be met: "(i) the defendant made a false statement to a bank; (ii) the defendant acted knowingly; and (iii) the false statement was made for the purpose of influencing the bank's actions on the loan." United States v. Tierney, 266 F.3d 37, 40 (1st Cir. 2001) (citation omitted). It is "unlawful to 'knowingly make[] any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation.'" United States v. Graham, 146 F.3d 6, 10 (1st Cir. 1998) (alteration and second omission in original) (quoting 18 U.S.C. § 1014). "'[F]or the purpose of influencing'" defines the required intent for such a claim. United States v. Norberg, 612 F.2d 1, 5 (1st Cir. 1979) (quoting United States v. Sheehy, 541 F.2d 123, 127 (1st Cir. 1976)). Buoi argues that no reasonable jury could find that he knowingly made false statements with the intent to influence a financial institution because he truthfully told BOA that he had little payroll and did not file taxes, and thus he had no tax forms. We again disagree.

The evidence presented at trial was sufficient for a reasonable jury to conclude that Buoi had the requisite intent to influence a financial institution. Buoi's main argument is that:

> [N]o jury reasonably could conclude that the *false statements within* Forms 940 and 941 were intended to influence Bank of America, given Buoi's insistence throughout the Bank of America application process that he had no such information or documents . . . [and] sought to *prevent* any influence by emailing and calling Bank of America to explain his employee and payroll situation.

However, this argument lacks merit because a bank's "awareness of the fraud is not relevant." United States v. Behenna, No. 94-1571, 1995 WL 3731, at *4 (1st Cir. Jan. 5, 1995) (per curiam) (unpublished table decision); see also United States v. Kellet, No. 94-1920, 1995 WL 449640, at *2 (1st Cir. July 31, 1995) (per curiam) (unpublished table decision) (explaining that bank's awareness of fraud is not relevant because said awareness is not inconsistent with defendant's fraudulent intent (citation omitted)). Therefore, the jury could reasonably conclude that Buoi intended to influence BOA even if he was unlikely to succeed. There were also additional BOA employees involved in processing PPP loan applications -- as evidenced by his application being forwarded to another BOA employee -- who were potentially unaware of the statements that Buoi had made to the one employee that he worked with directly. Because "certain decision-makers in the bank still remained to be influenced," the jury was justified in

- 18 -

finding that the statements made were for the purpose of influencing BOA. Sheehy, 541 F.2d at 128 (citation and internal quotation marks omitted).

In addition, there were other documents provided to BOA, besides the tax forms, that contained false information. Buoi submitted the PPP loan application and the fabricated payroll processing sheets before he was asked to provide the tax forms. This evidence lends support to the jury's finding that Buoi intended to provide false statements in an attempt to influence BOA to approve his PPP loan application, as it was done before he admitted to BOA that he had very little payroll and no tax documentation. Buoi also testified that he did not have the intent to mislead the bank in its lending decisions. As noted previously, it is not our job, but the jury's, to determine which witnesses to credit and which to discredit. See Soler-Montalvo, 44 F.4th at 8. These facts, coupled with Buoi's admission that he submitted the tax forms in order to obtain his PPP loan and all of the evidence supporting his intent to defraud, were enough for the jury to conclude that he intended to influence BOA.

## B. Ineffective Assistance of Counsel Claim

### Standard of Review

Lastly, Buoi claims ineffective assistance of counsel based on two reasons: (1) his counsel requesting a jury instruction that focused the jury away from specific intent language and

instead on good faith language, and (2) his counsel's failure to poll the jury. An ineffective assistance of counsel claim typically cannot be raised for the first time on direct review as there is no record from the lower court to reference. See Mala, 7 F.3d at 1063. Ineffective assistance of counsel claims are inherently fact dependent and require insight into counsel's decision making. See United States v. Staveley, 43 F.4th 9, 17 (1st Cir. 2022) (explaining reliance on record for ineffective assistance of counsel claims). "If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive" or was the best alternative available. Massaro v. United States, 538 U.S. 500, 505 (2003). Where there is no additional development of fact, we may not be able to determine if there was prejudicial error. See id. As such, an ineffective assistance of counsel claim that is raised for the first time on appeal should typically be addressed through a collateral proceeding under 28 U.S.C. § 2255. Staveley, 43 F.4th at 19; see Massaro, 538 U.S. at 504 ("[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance.").

In special, limited circumstances, however, "where the critical facts are not genuinely in dispute and the record is

sufficiently developed to allow reasoned consideration of an ineffective assistance claim, an appellate court may dispense with the usual praxis and determine the merits of such a contention on direct appeal." United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). On appeal, it is "strongly presumed" that counsel has "'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment' . . . and that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant." Burt v. Titlow, 571 U.S. 12, 22-23 (2013) (quoting Strickland v. Washington, 466 U.S. 668, 687-90 (1984)).

Here, Buoi's claims are not those in which "critical facts are not genuinely in dispute and the record is sufficiently developed." Natanel, 938 F.2d at 309. Buoi claims that the record is adequately developed for us to reach the merits of his ineffective assistance claims. As to his instructional claim, Buoi argues that there is an adequate record because there is a record of which jury instructions were requested, which were not requested, and which were given. As to his polling claim, Buoi argues that there is an adequate record regarding counsel's decision not to poll the jury because the trial transcript reflects that the jury sent a question during deliberation, the circumstances surrounding a juror having to leave early and an impending snowstorm closing the court for the remainder of the

week, and the fact that defense counsel was asked if they wanted to poll the jury.  However, we conclude, in accordance with our precedent's guidance, that there is no adequate record with which to determine the effectiveness of counsel's decisions.  See Staveley, 43 F.4th at 17 ("There is little in the record to explain 'why counsel acted as he did.'" (quoting United States v. Torres-Rosario, 447 F.3d 61, 65 (1st Cir. 2006) (emphasis in original))).  Without further fact development, there is no way to determine why counsel made their decisions at trial and a collateral proceeding is the appropriate place to explore those necessary additional facts.[2]  See Martinez v. Ryan, 566 U.S. 1, 13 (2012) ("Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim.").  We therefore decline to reach the merits of Buoi's ineffective assistance of counsel claims and dismiss them without prejudice.

---

[2] Insofar as Buoi argues that counsel's thought process is irrelevant because no defensible rationale exists for his actions, that argument only reinforces our conclusion.  The only support Buoi cites for the proposition that there was no defensible rationale for counsel's actions is his own understanding of what competent counsel would have done in that scenario.  But that is hardly the proper benchmark by which we measure ineffective assistance of counsel.  To be sure, Buoi's trial counsel may have had legitimate reasons for his actions, which are simply unclear from the record.  Any argument that trial counsel did not have a defensible rationale for his actions is, at bottom, speculative and improper for review on appeal at this moment.

## III. Conclusion

Because we conclude that there was sufficient evidence presented for a reasonable jury to find intent to defraud and intent to influence beyond a reasonable doubt and because we dismiss Buoi's ineffective assistance of counsel claims as improper for review on direct appeal, Buoi's convictions are

**<u>Affirmed</u>**.