UNITED STATES of America, Appellee,

v.

Colin NORBERG, Defendant-Appellant.

No. 79–1116.

United States Court of Appeals,
First Circuit.

Argued Oct. 2, 1979.

Decided Dec. 18, 1979.

W. Wright Danenbarger, Manchester, N. H., with whom Wiggin & Nourie, Manchester, N. H., was on brief, for appellant.

Robert J. Lynn, Asst. U. S. Atty., Concord, N. H., with whom William H. Shaheen, U. S. Atty., Concord, N. H., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and BONSAL, Senior District Judge.*

BOWNES, Circuit Judge.

Defendant-appellant, Colin Norberg, was convicted after a jury-waived trial on seven counts of submission of false statements to a federally insured bank in violation of 18 U.S.C. § 1014[1] and 18 U.S.C. § 2.[2] In essence, defendant was found guilty of submitting false invoices between August 2 and October 13, 1977, to the First Bank and Trust Company of Meredith, New Hampshire (the Bank), and, thereby, obtaining for his own use a portion of the proceeds of a loan given by the Bank to the Belknap Realty Trust (the Trust). The sole issue on appeal is whether the district court erred in finding that the government had proven beyond a reasonable doubt that defendant had knowingly made materially false statements as alleged in the indictment.[3]

---

* Of the Southern District of New York, sitting by designation.

1. 18 U.S.C. § 1014 provides in pertinent part: Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation . . . upon any application, advance . . . commitment, or loan . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

2. 18 U.S.C. § 2 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. The word "material" does not appear anywhere in 18 U.S.C. § 1014. Since, however, the indictment charged the defendant with making or causing to be made "materially false statements," the government has conceded that, for purposes of this case, it had to prove materiality. We do not decide whether, under 18 U.S.C. § 1014, materiality is an essential element of the offense.

**2**

*The Facts*

The relevant facts are not in dispute. It is to be noted at the outset that defendant, a practicing attorney in Meredith, New Hampshire, was a director of and attorney for the Bank from whom the loan was obtained and a trustee and beneficiary of the Trust to whom the loan was made. His position as attorney and trustee-beneficiary put him at both the source and the disbursement end of the loan.

The Trust was formed in 1972 for the primary purpose of constructing and operating a shopping center in Meredith, New Hampshire. The original trustees were John R. Goode, Norberg, and G. Martin Brill Watts of Pennsylvania. Due to the withdrawal of Goode and the death of Watts, the identity of the trustees changed between 1972 and 1977, but Norberg was always the active resident trustee. As such, he handled the daily business of the Trust, collecting the rents and supervising the maintenance of the shopping center. Originally, Norberg's wife did the bookkeeping and handled the Trust checkbook. In the spring of 1976, it was decided that the Trust checkbook would be kept by the Bank rather than Norberg.

The Trust Agreement provided:

The Trustees shall also have the right, power and authority, in their sole discretion, to make loans, from time to time, to any of the beneficiaries of this Trust, upon such terms and conditions as the said Trustees shall, in their sole discretion, deem advisable.

In 1973 and 1974, Norberg exercised his right to borrow money from the Trust for use in other business endeavors. All of these loans were repaid to the Trust.

In 1976, a serious sewage disposal problem developed at the shopping center. A repair estimate in the approximate amount of $55,000 was obtained and a general contractor offered to undertake the work for not less than $55,000. This proposal included the services of Dana Wein, who had retained Norberg as his attorney in a pending divorce action, as a subcontractor.

Norberg applied for and obtained a written commitment from the Bank to loan the Trust $55,000 for the sewage disposal work. It was agreed that the loan would be secured by a second mortgage on the shopping center. Since the other trustee, the Watts estate, held a second mortgage on the property, Norberg prepared and delivered to the Bank a borrowing resolution and subordination agreement.[4] The Bank then granted the loan and took a second mortgage on the shopping center.[5]

The Bank suggested that the entire sum be deposited in an account in the name of the Trust to be drawn against as required. Norberg requested that the Bank allow him to establish a separate "sewer renovation" checking account against which funds would be drawn as needed. According to Norberg, this would reduce interest charges and give him a record of damages for use in a law suit to be brought against the contractor who originally built the shopping center. The Bank agreed to Norberg's request and he was furnished a supply of checks for the account.

Wein had told Norberg that the total cost of his work as subcontractor would be between $6,000 and $7,000. He agreed to furnish Norberg with weekly statements of his labor and material costs from which Norberg would deduct income tax and social security withholdings and give Wein a check for the balance. Norberg told Wein that "he wanted to make some money" and was interested in having the project completed for less than the $55,000 estimated cost. Wein first submitted his weekly statements of labor and materials on ordinary paper. Norberg then obtained printed invoice forms from Wein entitled "Dana A. Wein & Sons," which had been used in a

---

4. There is some question as to the validity of this agreement, but that is not an issue.

5. The principal of the general contractor, W. F. Richards & Son, Inc., was also a director of the Bank.

former contracting business.[6] Norberg then had these invoices made out in larger amounts than Wein's actual charges for labor and materials. At first, Norberg would give a check and the false invoice to Wein who would cash it at the Bank and return the funds to Norberg. As the discrepancy between actual charges and the invoices increased, Norberg decided to transfer the funds from the Bank to himself directly without an intermediary so he had Wein endorse the checks in his office.[7] When Wein raised some questions as to the continued use of false invoices, Norberg told him not to be concerned since the money was really his and would be repaid. Norberg obtained $19,200 for his personal use by the false invoice method before Wein decided to stop cooperating. The scheme ended when it dawned on Wein that he might be liable for income taxes on money not actually received by him. Wein consulted an attorney who suggested that he report the matter to the New Hampshire Attorney General. This was done and an investigation was promptly begun.

At no time did the Bank know that any of the money drawn from the "sewer renovation" account went to Norberg for his personal use. The Bank's president and loan officer both testified that a loan to Norberg would have required the approval of the Board of Directors. The loan officer further testified that Norberg would not have been given an unsecured loan because he had other loans outstanding at the time. Nor was the other trustee and beneficiary advised by Norberg that he was using part of the moneys advanced for the sewage disposal repairs for his own purposes. Norberg did repay the $19,200 to the Trust. When the Bank learned of the false invoice scheme, it issued a demand letter to the Trust. The loan was not repaid, but interest payments have been kept current and the Bank has taken no further steps to collect the principal amount.

*The Law*

The essential elements that the government had to prove under the statute and the indictment are:

(1) that the Bank's deposits were insured by the Federal Deposit Insurance Corporation;

(2) that defendant made false statements to the Bank;

(3) that defendant knew the statements were false; and

(4) that the statements were materially false [8] and made for the purpose of influencing the Bank to make a loan or advance.

*United States v. Kramer*, 500 F.2d 1185, 1187 (10th Cir. 1974); *United States v. Kernodle*, 367 F.Supp. 844, 851–52 (M.D.N.C. 1973), *aff'd without opinion*, 506 F.2d 1398 (4th Cir. 1974).

There is no issue as to the first three elements since the insurance requirement was stipulated and defendant has admitted that he knew the invoices were false. Norberg, therefore, focuses on the fourth element and argues that the statements were not "material" because they were not made for the purpose of influencing the Bank to make a loan or advance, and did not do so.

The facts defendant uses to support this argument are as follows. The loan from the Bank to the Trust, which was legally obtained, was fully secured by a second mortgage on the shopping center. The Bank had no interest in making progress payments on the work. This was a "single-stroke" loan and the Bank's only concern was that the amount loaned be repaid according to the terms of the loan agreement. In this connection, defendant points out that the Bank suggested that the entire amount of $55,000 be paid over to defendant as trustee to be disbursed by him. The utilization of a separate "sewer renovation" checking account was, defendant stresses, his idea and done for the benefit of the

---

6. Wein had sold the name and goodwill of this business and at the time was operating in his individual capacity without a business name.

7. On one occasion, Norberg actually forged Wein's endorsement on a check.

8. *See* footnote 3, *supra*.

Trust. The separate checking account was not set up at the Bank's suggestion, nor did it benefit the Bank in any way. The only interest the Bank had in this account was to make sure that not more than $55,000 was transferred to it. Defendant does not deny that he obtained personal unsecured loans as the result of the false invoices, but argues that these came from the Trust, not the Bank, and, as trustee and beneficiary, he had the right to borrow money from the Trust. In short, it is defendant's position that, since the Bank was not and could not be harmed by the false invoice payments, the statements were not material and defendant is not guilty of violating 18 U.S.C. § 1014.

 This ingenious argument is not entirely a novel defense to a prosecution under this statute. Unfortunately for defendant, it is defeated by the words of the statute and the case law interpreting them. The basic question is whether the false invoices were furnished to the Bank "for the purpose of influencing in any way" its "action . . . upon any application, advance . . . or loan . . . ." 18 U.S.C. § 1014. It is not the result of the transaction upon which the statute focuses, but the purpose. There can be no doubt that the purpose here was to obtain, at the least, an interest free loan. If Wein had not blown the whistle, defendant would have had an opportunity to keep the $19,200 and neither the Bank nor the Trust would have known that it had gone into his pocket. It is true that, if Norberg had done as the Bank suggested and put the entire $55,000 in the Trust account, there would have been no crime against the Bank; only the Trust would have been involved. Defendant's own decision to set up a pay-as-needed checking account, however, involved the Bank as well as the Trust. Each advance on the overall loan was obtained by a false invoice.

In *United States v. Goberman*, 458 F.2d 226, 229 (3d Cir. 1972), the court dealt with a similar defense.

The appellant misconceives the meaning of materiality in Section 1014. It is not merely directed to false statements which are actually used in the decision to make a loan. It requires that all statements supplied to lending institutions such as Federal Savings & Loan Associations, which have the capacity to influence them, be accurate or at least not knowingly false, *Kay v. United States*, 303 U.S. 1, 5–6, 58 S.Ct. 468, 82 L.Ed. 607 (1938); *Poulos v. United States*, 387 F.2d 4 (10th Cir. 1968); *Blake v. United States*, 323 F.2d 245 (8th Cir. 1963). Requiring proof of reliance on the statement by the lending institution would wreak havoc with enforcement of the provision. A successful prosecution for the violation would depend on the wholly fortuitous factor of *actual reliance* and not at all upon the intent of the guilty party.

*See also United States v. Cleary*, 565 F.2d 43, 46 (2d Cir. 1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978) (essence of crime is the making of false statements with intent to influence bank, reliance is irrelevant); *United States v. Braverman*, 522 F.2d 218, 223 (7th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975) (a statement is material when it has "capacity to influence"); *United States v. Tokoph*, 514 F.2d 597, 602–03 (10th Cir. 1975) (materiality is determined by capacity to influence).

The Supreme Court, through Chief Justice Hughes, rebuffed cogently a similar defense in a conviction for false statements under the Home Owners' Loan Act, 12 U.S.C. § 1467.

It does not lie with one knowingly making false statements with intent to mislead the officials of the Corporation to say that the statements were not influential or the information not important. There can be no question that Congress was entitled to require that the information be given in good faith and not falsely with intent to mislead. Whether or not the Corporation would act favorably on the loan is not a matter which concerns one seeking to deceive by false information. The case is not one of an action for

damages but of criminal liability and actual damages is not an ingredient of the offense.

*Kay v. United States*, 303 U.S. 1, 5–6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938).

In the only First Circuit case on point,[9] we upheld a jury conviction of making false statements to influence bank action over the defense that a false statement as to the purchase price of property and the income of the defendant were not material because not relied upon by the Bank. We pointed out that the words "for the purpose of influencing" were included in the statute to define the quality of the required intent. *United States v. Sheehy*, 541 F.2d 123, 127 (1st Cir. 1976).

*Kovens v. United States*, 338 F.2d 611 (5th Cir. 1964), is a case very similar to ours. In affirming a verdict of guilty for knowingly making a false statement for the purpose of influencing bank action, the court stated:

It is plain that the indictment charged that, as to Count One, Kovens on December 8th knowingly caused a false certificate to be filed with the Association for influencing its action in advancing funds in that he submitted a Construction Draw requesting the payment of $149,946.86 and certifying that funds enumerated in the said Draw and itemized thereon *had been expended* as itemized, whereas, to his knowledge the Draw was false in that the entire amount of the funds enumerated was not expended as itemized. It would make no difference whether the amount was thereafter expended or if the amount was spent for a different purpose than that stated on the certificate, including the itemized list associated with it.

*Id.* at 616. The court held:

The statute deals with the falsity of any statement made for the purpose of influencing the Association as to the making of an advance. We agree that the purpose of Section 1014 is to protect authorized functions of specified institutions from "deceptive practices," *United*

*States v. Gilliland*, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598, as contended for by the appellants. But where, as here, the indictment charges that the appellant "for the purpose of influencing the action of the Association," submitted a Construction Draw requesting payment of the sum of $149,946.86, knowing the statements on said Draw to be false, it can hardly be said that there was an absence of an allegation which would support proof of the materiality of the alleged false statement.

*Id.* at 616–17.

Against this array of authority, while referring to bits and pieces from the language of other cases to buttress his risk of harm argument, defendant squarely pits only three cases. In *United States v. Kramer, supra*, 500 F.2d 1185, the court reversed the conviction of a bank president under 18 U.S.C. § 1014 for aiding, abetting, procuring and inducing a false financial statement. The statement was filled out by another, not the defendant, and the court found "[t]here is no evidence in the record that Kramer made, aided, abetted, induced or procured the making of the financial statement" and "sufficient evidence does not exist by which a jury could find that the financial statement was submitted to the bank for the purpose of influencing approval of the loan. . . . And, Kramer, as the bank's president, had unrestricted authority to make loans up to the bank's maximum lending limit. Under these circumstances a false financial statement could serve no useful or influential purpose." *Id.* at 1187. The facts of *Kramer* make it inapposite. Here, Norberg was the one responsible for the false invoices which were submitted for the principal purpose of obtaining money for his personal use.

*United States v. Dreyfus*, 528 F.2d 1064 (5th Cir. 1976), involved a conviction for filing false statements with the Department of Housing and Urban Development in violation of 18 U.S.C. § 1010. The court

9. The only other case from this circuit involving 18 U.S.C. § 1014, *United States v. Canas,* 595 F.2d 73 (1st Cir. 1979), was decided on unrelated issues.

**6**

remanded for a new trial because it felt the district court's charge had not properly covered the differences raised as to the count alleging that the "false statement [was made] for the purpose of influencing HUD to issue mortgage insurance." *Id.* at 1069. Contrary to the assertion in appellant's brief, there was no finding that, since the statement posed no harm or risk to HUD, there was no criminal liability. The court felt that the charge was not complete, not that there was no liability as a matter of law. *Id.* at 1070.

In *United States v. Beer*, 518 F.2d 168 (5th Cir. 1975), the court did reverse a conviction for making a false statement to the Federal Deposit Insurance Corporation, 18 U.S.C. § 1001, "because there was a failure of proof of the essential element of materiality." *Id.* at 173. The court in determining materiality recognized "that the agency need not actually have relied or acted to its detriment upon the false statement, but the government must still show that the statement had the capacity to influence a determination required to be made." *Id.* at 172. It further held: "If the functioning of a department or agency would not have been materially affected had it relied upon the statement, then the statement must necessarily be immaterial." *Id.* at 172. This contrasts starkly with the case at bar where the Bank would not have made an unsecured loan to Norberg.

 The facts in this case establish beyond peradventure that Norberg devised a scheme for using false invoices to obtain an unsecured loan from the Bank in the amount of $19,200. The invoices were submitted to the Bank for that purpose. The Bank made the advances as part of a loan for sewage disposal work. It did not know that part of the money was being diverted to Norberg's personal use. Norberg would not have obtained the money but for the false invoices. The fact that the Bank's loan was adequately secured does not render the invoices immaterial. The invoices became material when they produced the funds Norberg wanted. They not only had the capacity to influence the Bank's action, they did influence it.

*Affirmed.*